## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>ALAKE TERRY ILEGBAMEH,<br>aka "Terry" | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br><br>**13-0706M** |
|---|---|

Complaint for violations of Title 18, United States Code, 371 (Conspiracy); Title 18, United States Code, Section 1546(a) (False Statement in Immigration Application).

FILED
CLERK, U.S. DISTRICT COURT

MAR  6 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

| NAME OF MAGISTRATE JUDGE<br><br>**HON. JAY C. GHANDI** | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSES<br><br>March 2008 to October 16, 2011 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

**COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:**

From in or about March 2008 to on or about October 16, 2011, in Los Angeles County, within the Central District of California, defendant ALAKE TERRY ILEGBAMEH, also known as "Terry," conspired with others to file applications, affidavits, and other documents required by the immigration laws and regulations prescribed thereunder containing false statements with respect to material facts that were knowingly made under oath and knowingly subscribed as true under the penalty of perjury, and knowingly presented such applications, affidavits, and other documents that contained such false statement and that failed to contain any reasonable basis in law or fact, in violation of 18 U.S.C. §§ 371 and 1546(a).

LODGED
2013 MAR -6
CLERK U.S. DIST
CENTRAL DIST
LOS ANGELES

**BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:**
(See attached affidavit which is incorporated as part of this Complaint)

**MATERIAL WITNESSES IN RELATION TO THIS CHARGE:**

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>DAN CARNEY            /S/ |
|---|---|
| | OFFICIAL TITLE<br><br>Special Agent - ICE |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) **Jay C. Gandhi** | DATE<br><br>March 6, 2013 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

SAUSA:  JAMES M. LEFT        WARRANT

# A F F I D A V I T

I, Dan Carney, being duly sworn, hereby depose and say:

## I.

## INTRODUCTION

1.    I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and I have been so employed since June 2010. Previously, I was employed with DHS, U.S. Customs and Border Protection as a Border Patrol Agent since July 2006. Through my employment with DHS, I have received training in the investigation and prosecution of cases involving immigration and visa fraud. I am currently assigned to the Document and Benefit Fraud Unit in Los Angeles, California. This unit conducts both immigration and criminal investigations relating to benefits fraud, including asylum fraud, the sale of counterfeit identification documents, visa fraud, and marriage fraud, which concerns aliens entering into marriages with United States citizens solely to obtain permanent resident status (commonly known as a "green card").

2.    During my career in law enforcement, I have participated in many criminal investigations as a case agent or in a subsidiary role. I have debriefed numerous defendants, informants, and witnesses who had personal knowledge regarding

criminal organizations. Additionally, I have participated in many aspects of criminal investigations, including undercover operations, surveillance, and search warrants.

3. I make this affidavit based on personal knowledge derived from my participation in this investigation and upon reliable information from the following sources:

a. Oral and written reports about this and other investigations that I have received from other federal agents and other government agencies;

b. Physical surveillance conducted by federal agents, including myself, in which electronic aids were used;

c. Rental agreements, utility records, telephone records, and subscriber information;

d. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, an SA of HSI or another government officer provided the information and that person had either direct or hearsay knowledge of the statement, and I spoke to that person or reviewed that person's report(s).

4. Because this affidavit is being submitted for the limited purpose of supporting an application for a criminal complaint and arrest warrant, I have not set forth each and every fact learned during the course of this investigation. Facts not set forth herein are not being relied upon in reaching

2

my conclusion that the complaint and arrest warrant should be issued.

5.    This affidavit is made in support of the issuance of a criminal complaint and arrest warrant against ALAKE TERRY ILEGBAMEH, also known as "Terry," for violations of Title 18, United States Code, 371 (Conspiracy); and Title 18, United States Code, Section 1546(a) (False Statement in Immigration Application).

6.    As discussed further below, ILEGBAMEH is a Nigerian national who arranged sham marriages for at least 16 aliens so that these aliens could obtain permanent resident status through fraudulent marriages to United States citizens.  The United States citizens were paid to enter into these marriages.  In many cases, ILEGBAMEH instructed the couple how to make the marriage appear genuine by opening joint bank accounts, opening joint Costco accounts, obtaining driver's licenses with the same address, and taking photos of themselves.  These couples also filed visa petitions and applications for permanent residence with U.S. Citizenship and Immigration Service ("CIS").  By helping the couples create false documents and by providing attorneys for the couples, ILEGBAMEH assisted in the filing of fraudulent applications for permanent residence status.

## II.

## OBTAINING PERMANENT RESIDENT STATUS THROUGH MARRIAGE

## TO A UNITED STATES CITIZEN

A.    AN APPLICATION FOR ADJUSTMENT OF STATUS

7.    On or about July 24, 2012, I spoke with Dan
Clippinger, who has been employed with CIS as a Senior
Immigration Services Officer since 2007.  Prior to that, Officer
Clippinger was an Immigration Services Officer with CIS and the
former Immigration and Naturalization Service ("INS") since
1996.  Officer Clippinger has extensive knowledge regarding visa
petitions, applications for adjustment of status, and the
requirements for such petitions and applications.  During his
time with INS and CIS, Officer Clippinger has adjudicated
thousands of visa petition and adjustment applications.

8.    Based upon my training, experience, and conversation
with Dan Clippinger, I know the process by which an alien may
obtain permanent resident status (commonly known as a "green
card") on the basis of marriage to a United States citizen.  To
obtain such status, a United States citizen spouse files a
Petition for Alien Relative (Form I-130), commonly known as a
"visa petition," on behalf of the alien spouse.  Either
simultaneously or sometime thereafter, the alien files an
Application to Register Permanent or Adjust Status (Form I-485),

4

commonly known as an "application for adjustment of status."

9.    An application for adjustment of status (Form I-485) is a document that requires an alien to provide basic biographical information including an alien's address.  The application also contains a series of questions addressing various bases by which an application may denied.  For example, these questions include whether an alien has engaged in any criminal activity.  These questions also include whether the alien has ever sought to procure a visa by fraud or willful misrepresentation of a material fact, which includes attempting to procure permanent resident status through fraud.

B.    THE INTERVIEW PROCESS

10.    According to Officer Clippinger, CIS typically conducts separate interviews of the spouses prior to a decision on the visa petition and adjustment of status application.  Both spouses are placed under oath before their interviews are conducted.  CIS conducts these interviews to determine whether a particular marriage is valid.  For example, a CIS Adjudications Officer ("AO") will ask the spouses where they live and work.  An AO may also ask an alien the same questions that appear in the adjustment application, such as questions relating to any prior criminal activity, to evaluate whether an alien is a suitable candidate to become a permanent resident.

11.    According to Officer Clippinger, an AO is trained as to the importance of the questions posed to an alien and the alien's spouse and why certain answers to questions may undermine the validity of the marriage or the alien's overall suitability for permanent resident status.  An AO may decide that documentation provided in support of the visa petition and the adjustment application and the answers provided during the interviews are an insufficient basis to grant an alien permanent resident status.  If so, the AO may request additional documentation or make a request to ICE for an investigation.

C.    MATERIALITY OF FALSE STATEMENTS

12.    According to Officer Clippinger, an alien providing a false address on an adjustment application or during a CIS interview is an important material misstatement.  If a CIS officer became aware of such a false statement, it would cause the officer to question the validity of the marriage, because confirmation of an actual marital residence is a clear indication of a valid marriage.  Providing a false address as to residence would also cause a CIS officer to question whether the visa petition and adjustment of status application should be granted.  In the alternative, even if based upon other evidence the marriage appeared valid, providing a false address would cause CIS to conduct further inquiry as to why this occurred.

6

The results of the investigation may lead CIS to conclude that the adjustment application should be denied.

D.    INTENT TO ESTABLISH A LIFE TOGETHER

13.    Based upon my training and experience, I also know that an alien spouse and a United States citizen spouse must have the intent to establish a life together at the time of their wedding for the marriage to be valid.    An alien entering into a marriage solely to obtain permanent resident status does not have the requisite intent.    It is instead an act of marriage fraud that is a violation of law.

### III.

### START OF THE INVESTIGATION

14.    On January 13, 2011, the DHS Tip Line received a report of possible marriage fraud.    The caller reported that Monica Nwatu married a man named "Kyle" so that she could obtain a green card.    The caller stated that Nwatu and "Kyle" are no longer living together and that Nwatu paid "Kyle" $2000 to marry her.

15.    Following this tip, I began to investigate the marriage of Monica Nwatu, a Nigerian national, to Carl Cooper, a United States citizen, who married on May 28, 2010.    During an interview with me, Cooper admitted that his marriage was a sham and that a former friend, Anthony Walton, gave him the idea to

7

do it.  Cooper's statements and his phone records also implicated ILEGBAMEH in the marriage fraud scheme.

16.  I also discovered that Stella Eziaku Nwosu, a citizen of Nigeria, married Anthony Walton, a United States citizen, on May 15, 2010.  During an interview with me, Walton also admitted that his marriage was sham.[1]

17.  Following the interviews of Cooper and Walton, I conducted searches in DHS databases to find Nigerian nationals who had the same attorney as Nwatu and Nwosu.  I also subpoenaed the phone records of ILEGBAMEH to determine if ILEGBAMEH had spoken with any of the same individuals or other individuals on a regular basis.

18.  I then interviewed the spouses of the suspected sham marriages.  As discussed below, in addition to admitting that their marriages were not legitimate, many of the United States citizen spouses told me about others who had also participated in sham marriages.  The following lists in detail eight fraudulent marriages and the corresponding applications filed with CIS.

---

[1]  In 1993, Walton was convicted of sale or transportation of a controlled substance.  In 1995, Walton was convicted of trespassing with injury to property.  Walton was convicted of possession of a controlled substance in 1995, 1996, 2001, and 2003.  Additionally, Walton has used the alias "Anthony Lydel

IV.

<u>INTERVIEWS OF CRAVON CHARLES AND SHANELL GATES</u>

19.    On or about September 27, 2011, HSI SA Aaron McClellan and I interviewed Cravon Charles at his place of employment in Lynwood, California.  At that time, Charles provided the following:

a.    Charles lived with his girlfriend, Martha Percy. Percy was paid to marry a man called "Kelvin."  "Terry" arranged the marriage.  Charles worked with "Terry" at Los Angeles Metro Hospital in 2007.

b.    "Terry" told Percy that she could make $5,000 or $6,000 by marrying someone.  "Terry" arranged for Percy to meet Chinedu Anokwute at a Jack in the Box restaurant.  "Terry" brought Anokwute to the meeting, and Charles brought Percy.

d.    "Terry" discussed the arrangement with Percy and showed her a schedule for payments to her.  Percy would receive a payment after the wedding ceremony, another after a meeting with the immigration officials, and a third after other obligations were met.

e.    One or two weeks later, Anokwute and Percy were married at a church.  "Terry" was present and paid Percy $1,000 afterwards.  "Terry" told Charles that he would be paid $500 for

Moore."

finding Percy, but "Terry" never paid him.

   f. Charles provided a number with a 213 area code for "Terry's" cell phone. "Terry" told Charles that "Terry's" lawyer advised "Terry" to change his phone number. According to Charles, "Terry's" old number had a 310 area code.

   g. Charles provided his cell phone number. Phone records obtained as part of this investigation revealed that calls were made between this number and a phone number belonging to ILEGBAMEH.

   h. Charles was shown a photo line-up and was asked if he could identify "Terry." Charles circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

  20. Later in the afternoon on September 17, 2011, Charles made a phone call to me. Charles told me that his sister needed to talk to me. A woman came on the phone and identified herself as Shanell Gates.[2] At that time, Gates told me the following:

   a. Gates admitted that she entered into a sham marriage with Philip Ifeanyichukwu.

   b. Gates confessed because she did not want to get into trouble. Gates agreed to meet me in person at a later date.

---

 [2] In 2010, Gates was convicted of petty theft.

21.    On or about October 6, 2011, Charles contacted me.  At
that time, Charles told me the following:

    a.    Charles wanted to disclose the names of everyone
who he had helped enter into sham marriages through ILEGBAMEH.

    b.    ILEGBAMEH gave him no money for the referrals,
but the people in the sham marriages paid him as a courtesy.

    c.    Charles helped arrange the marriages of Martha
Percy (Charles received nothing), Shanell Gates (Charles
received $100), Tristen Jones (Charles received $500), and
Victoria Childs (Charles received $100).

22.    Later on October 6, 2011, Charles contacted me again.
Charles admitted that he also referred Patrice Booker to
ILEGBAMEH and that he received $100 or $200 from Booker.

V.

PHILIP IFENAYICHUKWU'S MARRIAGE TO SHANELL GATES

A.    DOCUMENTS IN THE A-FILE FOR PHILIP IFENAYICHUKWU

23.    DHS A-File Number A203-249-163 is maintained for
Philip Ifeanyichukwu, who is a citizen of Nigeria.  The
documentation in this A-File includes a copy of a marriage
certificate, showing that Ifeanyichukwu married Shanell Gates, a
United States citizen, on October 21, 2010.  Ifeanyichukwu's A-
File also includes a Petition for Alien Relative, signed on
November 8, 2010, by Gates.  The petition lists 2110 West El

11

Segundo Boulevard, apartment 3, in Gardena as the marital residence.

24.   Ifeanyichukwu's A-File also contains an application for adjustment of status, which Ifeanyichukwu signed on November 8, 2010.  In this application, Ifeanyichukwu listed his address as the purported marital residence, and Ifeanyichukwu denied that he ever sought to procure a visa by fraud or willful misrepresentation of a material fact.  On or about January 9, 2012, CIS sent a letter, stating its intent to deny the application.

25.   Ifeanyichukwu's A-File also includes a CIS report, dated September 9, 2011, which states that the following:

a.   On July 5, 2011, Ifeanyichukwu and Gates appeared at CIS for an interview.  At that time, the interviewing officer identified some fraud indicators, such as Ifeanyichukwu divorcing his first wife one month prior to his entrance into the United States, discrepancies during the separated interviews of Gates and Ifeanyichukwu, and their joint bank account showing low activity.

b.   Due to these indicators, on September 2, 2011, IO Julie Yen and IO Marisela Rodriguez conducted a site visit to the purported marital residence.

12

     c.    IOs Yen and Rodriguez spoke with the property manager, who had worked at the apartment complex since 2003. The manager did not recognize a photo of Gates. The property manager stated that the tenant of apartment 3 was another person who had just moved to a bigger apartment in the building.

     d.    The property manager said the lease agreement submitted to CIS looked fabricated and listed the wrong name for the apartment manager.

     e.    The IOs then went to the bigger apartment, and only the brother of the tenant was present. The brother stated that he and his sister lived in the apartment with Philip Ifeanyichukwu and his wife. However, the brother did not know the name of Ifeanyichukwu's wife.

B.   <u>SECOND INTERVIEW OF SHANELL GATES</u>

   26.  On or about September 28, 2011, HIS SA Tara De Perte and I interviewed Shanell Gates at her home in Compton, California. At that time, Gates stated the following:

     a.    Gates was paid to marry Ifeanyichukwu so that Ifeanyichukwu could obtain a green card.

     b.    Gates met Ifeanyichukwu through her brother, Cravon Charles and "Terry." In October 2010, Charles, Gates, Ifeanyichukwu, and "Terry" met at a Burger King restaurant. "Terry" told Gates she would make $3,000 by marrying

13

Ifeanyichukwu and that Gates would be helping him out.  Gates
and Ifeanyichukwu attempted to exchange phone numbers, but
"Terry" would not allow it.  "Terry" wanted to make certain that
"Terry" got money from Ifeanyichukwu first so that Ifeanyichukwu
could not arrange the marriage without him.

       c.  Approximately one week later, Ifeanyichukwu and
Gates married in Los Angeles.  Charles and "Terry" attended the
wedding.  Ifeanyichukwu gave Gates a ring to make the wedding
look real.  "Terry" took pictures and said that the pictures
were needed so that they could be shown to the immigration
officials.

       d.  After the ceremony, Ifeanyichukwu handed $1,000
to "Terry," which "Terry" handed to Gates.  "Terry" told Gates
that she and Ifeanyichukwu had to remain married for two years.
Ifeanyichukwu and Gates were then allowed to exchange phone
numbers.

       e.  "Terry" told Gates and Ifeanyichukwu that they
had to get to know each other.  "Terry" said that they also
needed to call and text each other in case immigration officials
checked their phone records.

       f.  Gates never lived with Ifeanyichukwu and never
had sex with him.  Gates kissed Ifeanyichukwu only one time,
when they posed for pictures to make the marriage appear real.

g.    Before Christmas 2010, Ifeanyichukwu gave Gates a pair of shoes as a Christmas gift.  He instructed Gates to tell the immigration officials about them if they asked what she received for Christmas.

h.    "Terry" admitted to Gates that Ifeanyichukwu paid him to make a fake apartment lease with her name on it to show to the immigration officials.

i.    "Terry" told Ifeanyichukwu and Gates that they needed a joint bank account.  "Terry" took them to a Wells Fargo bank in Compton.  Ifeanyichukwu and Gates opened a joint account while "Terry" waited outside.

j.    On July 5, 2011, immigration officials interviewed Gates and Ifeanyichukwu.  "Terry" waited outside. Afterwards, Ifeanyichukwu was supposed to pay Gates $1,000, but he did not have the money.  Ifeanyichukwu instead wrote a check for less than $1,000.  "Terry" said that Ifeanyichukwu was "messing everything up" and that aliens usually pay on time.

k.    Ifeanyichukwu took out a life insurance policy on Gates.  Gates initially did not know about it, and she did not sign any forms.  After she found out, Gates confronted Ifeanyichukwu.  Ifeanyichukwu stated that "Terry" had told him to do it.  Ifeanyichukwu admitted that he forged Gates' signature.  To settle this problem, "Terry" told Ifeanyichukwu

15

to pay Gates $500, which Ifeanyichukwu never did.

      1.  "Terry" asked Gates if she could find any friends who would want to be paid to marry an African. "Terry" said that if her friends were willing to travel to Africa and marry someone there, they could earn $10,000 each.

      m.  Gates saw "Terry" recruit an American to marry an alien. "Terry" simply approached an unknown woman on the street, asked her to do it, and she agreed.

      n.  Gates was shown a photo line-up and was asked to identify "Terry." Gates circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

C.  <u>FIRST CONSENSUALLY MONITORED RECORDING WITH GATES</u>

      27.  On or about October 13, 2011, SA De Perte and I conducted a consensually monitored recording between Gates and Ifeanyichukwu at the apartment of Ifeanyichukwu. ILEGBAMEH was supposed to attend this meeting, but he never showed. The following occurred before and during the meeting:

      a.  Before the meeting, Gates was supposed to meet ILEGBAMEH at a gas station in Gardena. ILEGBAMEH did not show, and Gates called ILEGBAMEH. Gates stated that she needed money and that she needed ILEGBAMEH's assistance to obtain it from Ifeanyichukwu. ILEGBAMEH agreed to call Ifeanyichukwu.

   b.    Gates also told ILEGBAMEH that she had a friend who was willing to get married.  Gates wanted to know how much her friend would be paid.  ILEGBAMEH avoided talking about it and directed Gates to meet him at a certain intersection.  Gates drove there.

   c.    Gates called me and told me that ILEGBAMEH wanted to meet her.  Gates stopped at a gas station at the intersection.  While parked, Gates called ILEGBAMEH, who told Gates to wait for him.  ILEGBAMEH did not show up.

   d.    Gates then met with Ifeanyichukwu at his apartment in Gardena.  Ifeanyichukwu told Gates to meet the manager of the apartment complex.  Ifeanyichukwu said that the manager was supposed to get to know Gates.

   e.    Gates said that she had divorce papers in the car for Ifeanyichukwu to sign.  Gates stated that there was no purpose in continuing their situation, because a year had passed, and Ifeanyichukwu had not received his immigration papers.

   f.    Ifeanyichukwu responded that Gates was supposed to call the immigration officials because she was his wife.  Ifeanyichukwu said that Gates needed to be married until January.

17

g.    Gates told Ifeanyichukwu that the situation was not fair, because her life was put on hold.  Ifeanyichukwu said that they agreed on this.  Gates replied that she was going to file the divorce papers and that she was going to withdraw her visa petition.

D.    PHONE CALL RECEIVED FROM GATES

28.    On or about October 21, 2011, I received a telephone call from Shanell Gates, who said that "Terry" called her and threatened her.  "Terry" said that Homeland Security was investigating and was suspicious of Gates.  "Terry" questioned Gates as to why she wanted to talk with him.  "Terry" also said to Gates, "You are playing games" in a threatening manner. "Terry" also demanded to talk to her brother, Cravon Charles.

E.    THIRD INTERVIEW OF GATES

29.    On or about May 11, 2012, HSI SA Patti Ann Fitzsimmons and I interviewed Gates.  Gates stated that Ifeanyichukwu had been contacting her and requesting her to go with him to see their lawyer.  Ifeanyichukwu offered Gates $2,000 to continue the sham marriage.  Ifeanyichukwu promised Gates $1,000 after re-filing "the papers" and another $1,000 after the immigration officials interviewed them.

18

F.    CONSENSUALLY MONITORED PHONE CALL TO IFEANYICHUKWU

    30.    Shortly thereafter on May 11, 2012, Gates made a
consensually monitored phone call to Ifeanyichukwu.  During the
call, Ifeanyichukwu stated that Ifeanyichukwu and Gates were
going to see their lawyer "George" so that the lawyer could
explain the re-filing procedure.  Gates asked if Ifeanyichukwu
would have the $2,000 that was promised to her, and
Ifeanyichukwu replied "ya, that's what I'm (inaudible)."

F.    LEASE FOR APARTMENT 3 AT 2110 WEST EL SEGUNDO BOULEVARD IN
      GARDENA

    31.    On or about March 22, 2012, I obtained copies of
leases for 2110 West El Segundo Boulevard, apartment 3 in
Gardena, the purported marital residence of Ifeanyichukwu and
Gates.  (As previously stated, Ifeanyichukwu later moved to the
larger apartment.)

    32.    The former lease for apartment 3, dated February 1,
2005, listed B.U. and F.P. as the tenants.  The current lease
for apartment 3 lists C.J. and T.J. as the tenants.  The lease
for apartment 3 that was submitted to CIS, dated October 2010,
listed Ifeanyichukwu and Gates as the tenants.  The management
company stated that Gates' lease was not accurate, because L.S.
was the tenant of apartment 3 at that time.

19

## VI.

## CHINEDU ANOKWUTE'S MARRIAGE TO MARTHA PERCY

A.    DOCUMENTS IN THE A-FILE FOR CHINEDU ANOKWUTE

33.    DHS A-File Number A087-130-846 is maintained for Chinedu Anokwute, a citizen of Nigeria.  The documentation in this A-file includes a copy of a marriage certificate showing that Anokwute married Martha Percy, a United States citizen, on April 9, 2008.  Anokwute's A-File also includes a Petition for Alien Relative, signed on November 3, 2008, by Percy.  The petition lists 13432 South Vermont Avenue, apartment 12, in Gardena as the marital residence.

34.    Anokwute's A-File also contains an application for adjustment of status, which Anokwute signed on November 3, 2008. In this application, Anokwute listed his address as the marital residence, and Anokwute denied that he ever sought to procure a visa by fraud or willful misrepresentation of a material fact. The application was approved on May 20, 2009.

B.    INTERVIEW OF MARTHA PERCY

35.    On or about September 28, 2011, SA De Perte and I interviewed Percy at a home in Compton.  Shanell Gates was also present.  At that time, Percy stated the following:

a.    Percy lived in an apartment in South Gate, California with her boyfriend, Cravon Charles.

20

b.    Percy was paid to marry Anokwute so that he could gain immigration status in the United States.  Percy met Anokwute through "Terry."  Percy knew "Terry" because "Terry" used to work with Charles.

c.    In 2008, "Terry" told Percy that she could earn between $1,000 and $1,500 by marrying someone for six months to one year.

d.    One week later, Percy met Anokwute and "Terry" at a Jack in the Box restaurant.  "Terry" and Anokwute gave Percy a list of items to obtain, including a W-2 form, a social security card, and a birth certificate.  "Terry" and Anokwute told Percy that Percy and Anokwute needed to obtain a joint Costco account to make the marriage appear real.

e.    About one and a half weeks later, Percy and Anokwute were married in Inglewood.  Afterwards, they ate a Chinese restaurant and took pictures to make the marriage appear legitimate.  Anokwute paid Percy $500 after the ceremony.

f.    Anokwute and Percy opened a joint bank account to make the marriage look real.  Percy never had access to this account.

g.    Upon Anokwute's instructions, Percy obtained identification from the DMV that listed Anokwute's address and

last name.

       h.    On an unknown date, an immigration official interviewed Anokwute and Percy.  Afterwards, Anokwute paid Percy $1,000.  Anokwute paid Percy another $20 three or four days after the immigration interviews.

       i.    Percy last saw Anokwute approximately three weeks beforehand, when she signed divorce papers.  Earlier, Percy had told Anokwute that she wanted a divorce.  Anokwute delayed it, because the process of obtaining his green card was taking a long while.

       j.    "Terry" previously came to Percy's work and asked her friends if they wanted to get paid to marry someone.  They denied "Terry's" offer.  "Terry" told Percy that if any of her friends would go to Africa and marry someone, they could earn $5,000 to $10,000.

       k.    Percy's cousin, Tristen Jones, had a sham marriage.  A friend of Charles, Michael Buchanan, had been involved in several sham marriages.  Buchanan's girlfriend, Victoria Childs, had also been involved in two sham marriages.

       l.    Percy was shown a photo line-up and was asked if she could identify "Terry."  Percy circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

36.  Later on September 28, 2011, Percy called me and told me that another relative, Patrice Booker, had a sham marriage.

C.  LEASE FOR 13432 SOUTH VERMONT AVENUE, APARTMENT 12, IN GARDENA

37.  On or about May 4, 2012, I obtained a copy of the lease for 13432 South Vermont Avenue, apartment 12, in Gardena, the purported marital residence of Percy and Anokwute.  The lease listed V.I. and O.I. as the tenants as of July 22, 2005.  The property manager stated these tenants were still living in the apartment.

38.  On or about May 11, 2012, I interviewed Ruthann Bragg, the Vice President of Jenkins Property Management, the company that managed the apartment building at 13432 South Vermont Avenue in Gardena.  At that time, Bragg provided the following information:

a.  Bragg was shown the lease submitted to CIS.  Bragg stated that the "Monthly Agreement" was not one of her company's forms.  The lease contained an inventory check list, which her company did use at that time.

b.  The lease submitted to CIS is dated April 1, 2008.  Bragg stated that the current tenants of that apartment lived there prior to 2008 and that no other lease has been signed since the current tenants moved in.

23

## VII.

## <u>OBINNA UDE'S MARRIAGE TO VICTORIA CHILDS</u>

A.    <u>DOCUMENTS IN THE A-FILE FOR OBINNA UDE</u>

39.    DHS A-File Number A210-059-262 is maintained for Obinna Ude, who is a citizen of Nigeria.    The documentation in this A-File includes a copy of a marriage certificate showing that Ude married Victoria Childs, a United States citizen, on December 9, 2010.

40.    Ude's A-File also includes a Petition for Alien Relative, signed on March 18, 2011, by Childs.    The petition lists 1659 West 60th Street in Los Angeles as the purported marital residence.

41.    Ude's A-File also contains an application for adjustment of status, which Ude signed on March 18, 2011.    In this application, Ude listed his address as the purported marital residence, and Ude denied that he ever sought a visa by fraud or willful misrepresentation of a material fact.    The application was approved on August 24, 2011.

B.    <u>INTERVIEW OF VICTORIA CHILDS</u>

42.    On or about October 5, 2011, U.S. Department of State SA Alex Benoliel and I interviewed Childs at an apartment in South Gate.    Michael Buchanan, the boyfriend of Childs, was also present.    At that time, Childs stated the following:

24

a.   In January 2011, Childs was paid to marry Ude. Childs met Ude through Cravon Charles and "Terry." "Terry" specifically told Childs that she could make money by marrying someone.

b.   Childs met with Charles, Ude, and "Terry" at a wedding chapel, where Childs and Ude were married. After the ceremony, Ude paid Childs $400. Ude and "Terry" took photos after the ceremony, when they went out to eat at a TGIFriday's restaurant.

c.   The next day, Childs, Ude, and "Terry" went to a lawyer's office in downtown Los Angeles to sign some papers.

d.   At a later date, "Terry" took Childs and Ude to Wells Fargo to open a bank account. "Terry" also took Childs and Ude to open an account at Costco. "Terry" also took Childs and Ude to the DMV. Ude handed Childs some completed paperwork, which Childs submitted to the DMV. Ude later gave Childs a California identification card with her name and the address of the purported marital residence. Childs has never been to that address and does not know what is there.

e.   Ude told Childs what information she needed to know about him for their interview with the immigration authorities.

f.    Childs later told Ude and "Terry" that she wanted out of the marriage. "Terry" told her that she will go to jail if she gets out of the marriage. "Terry" then began to show up at the house of Childs' aunt and pressured the aunt to tell Childs to stay in the marriage.

g.    In August 2010, Ude and Childs had their meeting with immigration officials. A different lawyer, a lawyer that Childs had previously met, with went with them.

h.    Childs referred Melanie Dodson and "Antoinette" to "Terry" so that they could be paid to marry someone. "Terry" paid Childs $100 for the referrals.

i.    Childs was shown a photo line-up and was asked if she could identify "Terry." Childs circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

C.    INTERVIEW OF MICHAEL BUCHANAN

43.    On or about October 5, 2011, SA Benoliel and I interviewed Michael Buchanan at an apartment in South Gate. Victoria Childs, the girlfriend of Buchanan, was also present. At that time, Buchanan stated the following:

a.    Buchanan met "Terry" through his friend Cravon Charles. "Terry" told Buchanan that he could earn $3,000 by marrying an alien, but that Buchanan first had to get a divorce because he was already married.

b.    "Terry" talked with Buchanan about Childs wanting to back out of her sham marriage.  "Terry" told Buchanan that if Childs backed out, she would go to jail.

c.    Buchanan was shown a photo line-up and was asked if he could identify "Terry."  Buchanan circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

D.    INTERVIEW OF TOMIKO COWLEY

44.    On or about February 21, 2012, HSI SA McClellan and I interviewed Tomiko Cowley at her home in Los Angeles, which was the purported marital residence of Ude and Childs.  (Cowley is the mother of Bennie Smith, who also engaged in fraud marriage, discussed below.)  At that time, Cowley stated the following:

a.    Cowley knew ILEGBAMEH through friends in the neighborhood.

b.    ILEGBAMEH once brought a tall, light skinned, African man, whom Cowley believed to be Ude, to her home.  Ude and Cowley signed a rental agreement, which stated that Ude and Childs lived at her residence and paid rent to Cowley.

c.    Cowley was shown a copy of the lease, which had been submitted to CIS.  Cowley admitted that her signature was on the document.  Cowley also verified her signature of four rent receipts.  Cowley signed the lease and four receipts at the same time.  Afterwards, Ude paid Cowley $40.

d.    Childs and Ude never lived with Cowley.

e.    ILEGBAMEH collected mail addressed to people other than Cowley.  Cowley did not know why this mail was sent to her address.

f.    ILEGBAMEH never gave Cowley any money or promised her any money.  On three occasions, ILEGBAMEH brought Cowley groceries, and on one occasion, ILEGBAMEH brought her beer and wine.

g.    ILEGBAMEH told Cowley that she could earn money by marrying an alien.  ILEGBAMEH stated that she would earn $7,000 by going to Africa to marry someone or she could earn $4,000 by marrying someone who was already in the United States. Cowley declined the offer.

h.    ILEGBAMEH had recently appeared paranoid, and ILEGBAMEH told Cowley that "people" had turned him in for arranging fraudulent marriages.

## VIII.

### BRIGHT EKE'S MARRIAGE TO PATRICE BOOKER

A.    DOCUMENTS IN THE A-FILE FOR BRIGHT EKE

45.    DHS A-File Number A203-239-134 is maintained for Bright Eke, who is a citizen of Nigeria.  The documentation in this A-File includes a copy of a marriage certificate showing that Eke married Patrice Booker, a United States citizen, on

28

August 10, 2010.  Eke's A-File also includes a Petition for
Alien Relative, signed on November 5, 2010, by Booker.  The
petition lists 8317 Towne Avenue in Los Angeles as the purported
marital residence.

46.  Eke's A-File also contains an application for
adjustment of status, which Eke signed on November 5, 2010.  In
this application, Eke listed his address as the purported
marital residence, and Eke denied that he ever sought to procure
a visa by fraud or willful misrepresentation of a material fact.
The application was approved on March 11, 2011.

B.   INTERVIEWS OF PATRICE BOOKER

47.  On or about October 5, 2011, SA Benoliel and I
interviewed Patrice Booker at her residence in Lynwood,
California.  The mother of Booker's boyfriend was also present.
At that time, Booker provided the following:

a.  Booker was paid to marry "Bright."  Booker was
shown a picture of Dozie Okonkwo, and Booker identified Okonkwo
as "Bright."  (As discussed later in this affidavit, Booker was
paid to marry two different Nigerians.  ILEGBAMEH did not
arrange the first marriage to Okonkwo.  Eke was her second sham
marriage husband.  In a second interview, discussed below,
Booker clarified that the story given during this interview was
actually in relation to Eke, not Okonkwo.)

29

b.    Booker met Eke through "Terry" and her nephew, Keith Bougere.  Booker later stated that the nephew was actually Cravon Charles.  Booker initially gave a false name for her nephew, because the woman present during the interview was not only the mother of her boyfriend.  She was also the grandmother of Charles.

c.    Booker met "Terry" with the intent of finding a lawyer and to be a witness for some reason.  Booker signed some paperwork and then realized that the papers were for a marriage.

d.    "Terry" offered Booker $1,000 to marry Eke, and Eke paid her $1,000 after the marriage.  After the wedding ceremony, "Terry" took Eke to an ATM machine to get the money. Booker and Eke then went to a Sizzler restaurant and took photos to show to the immigration authorities.

e.    Booker, Eke, and "Terry" went to a lawyer in downtown Los Angeles.  The lawyer told Booker to know where Eke lived, to know about his family, to know what the purported marital bedroom looked like, and on which side of the bed Eke slept.  The lawyer also told Eke and Booker to memorize each other's favorite foods and colors.  The lawyer told Booker and Eke to provide consistent story regarding how they met.  The lawyer also told Eke and Booker to obtain a joint bank account and a joint lease.

30

f.    Booker, Eke, and the lawyer attended a meeting with immigration officials.  Before this meeting, "Terry" took Booker and Eke to Bank of America to open a joint bank account and to Costco to obtain cards together.  This was done to make the marriage look legitimate.  Eke also put the cable bill in Booker's name.

g.    Booker never lived with Eke, and she never had sex with him.

h.    Booker was shown a photo line-up and was asked to identify "Terry."  Booker circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

48.    On or about November 14, 2011, HSI SA Nyasia Rosario and I interviewed Patrice Booker at her workplace in Lynwood, because further investigation revealed that Booker was married to two Nigerian nationals.  At that time, Booker stated that she accidentally identified Okonkwo as Eke.  Okonkwo was the first Nigerian that Booker was paid to marry, and Eke was the second. Booker was still married to Okonkwo when she married Eke.

C.    PHONE CALLS FROM PATRICE BOOKER

49.    On or about November 15, 2011, I received a call from Patrice Booker.  Booker reported that "Terry" came to her workplace and told her not to tell anyone that she knows him. "Terry" also told Booker that if she tells anyone about him,

"something" would happen to her.

50.    On or about March 16, 2012, I spoke with Patrice Booker on the phone.  Booker stated that she never lived with Eke.  Booker stated that she never signed a lease with him, but Eke had wanted her to sign a lease.

D.    INVESTIGATIVE FINDINGS

51.    The A-File of Eke contains a lease purportedly signed by Booker and Eke for a residence at 8317 Towne Avenue in Los Angeles.  The landlord was listed as Stella Onwutalu, and the lease contained a phone number for Onwutalu.  Subpoenaed phone records revealed 24 calls between Onwutalu's phone number and ILEGBAMEH's phone number between January 1, 2012, and June 17, 2012.

E.    INTERVIEW OF STELLA ONWUTALU

52.    On or about March 19, 2012, HSI SA Darwin Tchan and I interviewed Stella Onwutalu at her residence, 8317 Towne Avenue in Los Angeles.  At that time, Onwutalu stated the following:

a.    Onwutalu has allowed three people to rent a room in her house at different times.  One of these persons was Bright Eke, who stayed with her a "few months."  Eke paid $500 a month for rent, and he stayed alone at her house.  Onwutalu met Eke through an African man.  Onwutalu did not remember this man's name.

   b. Onwutalu was shown a copy of a lease found in the A-File of Eke.  The lease was allegedly signed by Onwutalu, but Onwutalu stated that the signature was definitely not her signature.  Onwutalu also stated that she never drafted a leased for her home.

   c. Onwutalu was shown a photo line-up and was asked if she could identify the man who introduced her to Eke. Onwutalu circled, initialed, and dated photo number 4, which was a photo 4 of ILEGBAMEH.

   d. Onwutalu stated that ILEGBAMEH never offered money in exchange for her signing a lease or using her address.

   e. Onwutalu was in contact with Eke and collected his mail.  I was granted permission to see the stack of mail that Onwutalu collected.  I observed numerous letters addressed to Eke and Booker.

   f. Onwutalu knew Booker as Eke's wife.  Booker never lived at Onwutalu's house with Eke, but Booker stayed there an unknown number of times.  Upon further questioning, Onwutalu said she did not know if Booker stayed at her house, but she heard a female's voice coming from Eke's room.

   g. Onwutalu was shown a photo line-up, and she was unable to positively identify Booker.

h.    Onwutalu did not have the phone number of ILEGBAMEH.  ILEGBAMEH called her whenever they talked on the phone.

F.    FOLLOW-UP INTERVIEW OF PATRICE BOOKER

53.    On or about May 11, 2012, SA Fitzsimmons and I interviewed Booker in Lynwood.  Booker stated that she last talked with Eke about one month beforehand.  Eke showed up at Booker's work site, because he wanted to file a joint tax return.  Booker declined.  About three weeks beforehand, Eke sent text messages requesting that Booker file a joint return.

IX.

IFEANYI NWAMBUONWOR'S MARRIAGE TO TRISTEN JONES

A.    DOCUMENTS IN THE A-FILE FOR IFEANYI NWAMBUONWOR

54.    DHS A-File Number 203-282-399 is maintained for Ifeanyi Nwambuonwor, a citizen of Nigeria.  The documentation in this A-File includes a copy of a marriage certificate showing that Nwambuonwor married Tristen Jones, a United States citizen, on October 15, 2010.  Nwambuonwor's A-File also includes a Petition for Alien Relative, signed on November 11, 2010, by Jones.  The visa petition lists 212 West Plymouth Street, apartment 6, in Inglewood as the marital residence.

55.    Nwambuonwor's A-File also contains an application for adjustment of status, which Nwambuonwor signed on November 11,

34

2010.  In the application, Nwambuonwor listed his address as the purported marital residence, and Nwambuonwor denied that he had ever sought to procure a visa by fraud or willful misrepresentation of a material fact.  The application was approved on May 24, 2011.

B.   INTERVIEW OF TRISTEN JONES

56.   On or about October 6, 2011, SA Benoliel and I interviewed Tristen Jones at her home in Hawthorne, California.  At that time, Jones provided the following:

a.   Jones was paid to marry Nwambuonwor.  Jones met Nwambuonwor through Cravon Charles and "Terry."  Charles was the boyfriend of Jones' cousin, Martha Percy.  In July 2010, Charles asked Jones if she wanted to make some money.  Jones said that she was interested.  Jones then met Nwambuonwor and "Terry" at an African store in Inglewood.  Also present during this meeting were Nwambuonwor's aunt Florence and his uncle, whose name Jones did not recall.

b.   During the meeting, Florence talked about the marriage arrangement of Nwambuonwor and Jones with "Terry."  Florence was worried that it would not be believable.  Florence thought that Jones was too young.  "Terry" told her to not worry about it, because he had done this beforehand.

35

c.   Florence told "Terry" that if this sham marriage worked out, she had some friends that wanted to come to the United States.  Florence also asked "Terry" if he could arrange marriages for female aliens with male Americans.

d.   Florence and "Terry" asked Jones if she wanted to marry Nwambuonwor.  Jones agreed, and "Terry" told Jones that she would make $1,500.

e.   A couple of weeks later, upon "Terry's" instructions, Jones went to the residence of Nwambuonwor so that they could get to know each other.  Nwambuonwor had a list of information that they needed to learn about each other.  The information included dates of birth, places of birth, family members, and how they met each other.  Nwambuonwor and Jones also created a story as to how they became acquainted.

f.   On October 15, 2010, Nwambuonwor and Jones were married in Inglewood, California.  "Terry," Charles, Florence, and the uncle of Nwambuonwor attended.  After the wedding ceremony, they took photos.

g.   About one month after the wedding, Jones and Nwambuonwor met with a lawyer in Korea Town in Los Angeles.  "Terry," Florence, and Charles were also there.  After the meeting, Charles gave Jones $700 from Florence, which included a $500 check and $200 in cash.  Florence also paid "Terry" an

unknown amount of money by check.  "Terry" got angry.  "Terry" did not believe that he could cash the check, because he thought it was a holiday.  However, "Terry" cashed the check at a Bank of America branch that day.

       h.   "Terry" asked Jones if she had any friends who wanted to get paid to marry someone.  Jones did not refer anyone.

       i.   Jones was shown a photo line-up and was asked if she could identify "Terry."  Jones circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

C.   <u>INTERVIEW OF EDWARD PATTERSON</u>

   57.   Nwambuonwor's A-File contains a rental agreement for 212 West Plymouth Street, apartment 6, in Inglewood.  The agreement lists Tristen Jones and Ifeanyi Nwambuonwor as the renters and lessor as Florence Nwambuonwor-Ford.

   58.   On or about March 27, 2012, HSI SA Maria Castro and I interviewed Edward Patterson, the owner of the apartment building at 212 West Plymouth Avenue in Inglewood.  At that time, Patterson stated the following:

       a.   Patterson was shown a copy of the rental agreement for Jones and Nwambuonwor.  The agreement was dated October 16, 2010.  Patterson stated that he has owned the apartment building since 2008 or 2009, and he concluded that the

37

agreement was not legitimate.  The agreement was not in the correct format.

b.    Patterson stated that Florence Nwambuonwor-Ford was the tenant of the apartment in question.  Nwambuonwor-Ford lived there with two minor children.  Nwambuonwor-Ford had another son living with her, but he moved away to go to college.

c.    Nwambuonwor-Ford was not a property manager and did not have the authority to lease apartments.

d.    Upon being was shown a picture of Jones, Patterson stated that no one like her had lived at the apartment.

X.

### OBIAKACHI OJO GEORGE EGONU'S MARRIAGE TO MELANIE DODSON

A.    AN APPLICATION FOR ADJUSTMENT OF STATUS

59.    DHS A-File Number 210-097-251 is maintained for Obiakachi Ojo George Egonu, a citizen of Nigeria.  The documentation in this A-File includes a copy of a marriage certificate showing that Egonu married Melanie Dodson, a United States citizen, on March 30, 2011.  Egonu's A-File also includes a Petition for Alien Relative (Form I-130), signed on April 20, 2011, by Dodson.  The petition lists 23240 Sesame Street, apartment 37C, in Torrance, California as the marital residence. On October 12, 2011, Dodson submitted a declaration to CIS,

stating that Dodson withdrew her visa petition and that she was paid $1,500 to marry Egonu.

60.    Egonu's A-File also contains an application for adjustment of status, which Egonu signed on May 6, 2011.  In the application, Egonu listed his address as the purported marital residence, and Egonu denied that he ever sought to procure a visa by fraud or willful misrepresentation of a material fact. The application was denied on December 6, 2011.

B.    FIRST INTERVIEW OF MELANIE DODSON

61.    On October 6, 2011, SA Benoliel and I interviewed Melanie Dodson at her home in Compton, California.  At that time, Dodson provided the following:

a.    Dodson was paid to marry Egonu.  Victoria Childs asked Dodson if she wanted to make money by marrying someone, and Dodson agreed.

b.    A day or two later, Dodson met with Childs, Egonu, and "Bob," a cousin of Egonu.  "Bob" explained to Dodson that Egonu would get his green card through marriage.  "Bob" stated that everybody was doing sham marriages.  "Bob" told Dodson that she would not get caught.  "Bob" was asked how much money Dodson wanted, and Dodson said $5,000.  "Bob" and Egonu told Dodson that she would receive $3,500.

39

c.    Dodson and Egonu married on March 30, 2011 at E&R Services in Inglewood.  "Justina" ("Bob's" mother), "Tim" ("Bob's" brother), and "Terry" attended.  After the wedding ceremony, all of them went to PF Chang's restaurant and took pictures to make the marriage look real.  Either Egonu or "Bob" paid Dodson $1,000.

d.    Dodson never lived with Egonu and never had sex with him.

e.    Dodson got a Costco card with Egonu.  Egonu began to call Dodson frequently.  Dodson did not want to talk with him because their relationship was a business deal.

f.    In May 2011, "Terry" called Dodson to arrange a meeting.  Dodson, Egonu, "Terry," Childs, and "Bob" attended the meeting.  Dodson stated that she did not believe she was being told everything and that she was unhappy.  "Bob" and Egonu were angry at "Terry" for an unknown reason.  Dodson was told that she was going to get $500 after the meeting with the attorney and another $1,000 after the interview with the immigration authorities.  Egonu gave Dodson $200 by depositing it into their joint bank account.

g.    In June 2011, Dodson became upset with "Bob" and Egonu, and Dodson wanted a divorce.  "Bob" and Egonu called and harassed her.  "Terry" also called Dodson and asked her what the

problem was.   "Terry" told Dodson that he would take care of it.

      h.   In July 2011, Egonu, Dodson, "Bob," "Terry," and Childs had another meeting.   Dodson said that she wanted out of the marriage.   "Bob" offered her in $200 cash.   "Bob" told Dodson to meet with Egonu in two weeks to exchange information, and she would get paid another $200.

      i.   Dodson was shown a photo line-up and was asked if she could identify "Terry."   Dodson circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

C.   SECOND INTERVIEW OF MELANIE DODSON

      62.   On or about October 21, 2011, SA De Perte and I interviewed Dodson at her home in Compton.   At that time, Dodson provided the following:

      a.   CIS interviewed Dodson and Egonu on October 12, 2011.   Dodson confessed to CIS that she had been paid to marry Egonu.   Egonu did not know about the confession, but he was upset that he had not received his green card.   Dodson claimed that Egonu, "Bob," and "Terry" came to her house on October 16, 2011, to speak with her.   Dodson's neighbors had told Dodson that they had seen these men driving by the house several times looking for her.

      b.   During the meeting of October 16, "Terry" asked Dodson if she had told anything to CIS about the sham marriage.

41

Dodson denied revealing that the marriage was a sham. "Terry" said that everything would be "okay" as long as she did not admit it. "Terry," "Bob," and Egonu told Dodson that investigators may come to her house. They instructed Dodson not to let anyone tell that the investigators that she lived there. Dodsons's ten year-old son was instructed to not admit to the investigators that his mother lived there.

D.    INTERVIEW OF OBIAKACHI OJO GEORGE EGONU

63.    On or about January 6, 2012, HSI SA Loan McIntosh-Rupp and I administratively arrested Egonu, and subsequently, Egonu was placed into removal proceedings before the Immigration Court. After Egonu was arrested, SA De Perte and I then interviewed Egonu.[3] At that time, Egonu stated the following:

a.    Egonu met Dodson at a McDonald's restaurant in November 2010. No one introduced Egonu to Dodson, and Egonu never paid her any money to marry him.

b.    After the wedding, Dodson moved in with Egonu and stayed with him until October 2011. Dodson moved out after the interview with CIS. Dodson moved out because it would be easier for her to get to work.

c.    Egonu saw Dodson once per month. Egonu texted her every day, but Dodson did not respond.

---

[3]    Since Egonu was arrested administratively, no Miranda

42

      d.   Egonu had sex with Dodson.

      e.   "Terry" was a friend of Egonu, but Egonu did know him that well.

E.   <u>INTERVIEW OF JONATHAN RICHARDSON</u>

      64.  On or about July 27, 2012, HSI Investigative Assistant William Droz and I interviewed Jonathan Richardson near a park in Compton. Richardson was the boyfriend of Melanie Dodson. At that time, Richardson provided the following:

      a.   Richardson had dated Dodson since 2003, and Richardson was engaged to her. Richardson lived with Dodson at his parent's house in Compton. Prior to that, from October 2010 to December 2011, Dodson and Richardson lived together in an apartment in Compton. Before living in the apartment, Dodson and Richardson were neighbors living on the same street in Compton.

      b.   Richardson knew that Dodson was involved in a sham marriage with "Obi." Richardson knew that Dodson was promised $3,000 to marry Obi and that Dodson received about $2,500.

      c.   Richardson knew that "Terry" arranged the marriage and that "Terry" was the "head guy" for arranging sham marriages. "Terry" offered to buy Richardson dinner for

---

warnings were provided.

allowing Dodson to marry "Obi," but Richardson did not want anything from him.

    d.   Richardson met "Obi" a few different times. During the first meeting, Richardson did not have a conversation with "Obi." For the second meeting, "Obi" came to Richardson's apartment with two other African males. Obi and the two others discussed how they did not trust "Terry."

    e.   Richardson met "Terry" approximately five times. For one meeting, "Terry" showed up with two unknown African males. "Terry" showed up after Dodson did not answer phone calls from "Obi" or "Terry." After Dodson and "Obi's" interview with the immigration authorities, "Terry" told Richardson that something went wrong during the interview and that there would be an investigation. "Terry" instructed Richardson to say that Dodson did not live at Richardson's apartment in Compton if the investigators came there.

    f.   Richardson was shown a photo line-up and was asked to identify "Obi," the fake husband of Dodson. Richardson circled, initialed, and dated photo number 4, which was a photo of Egonu.

    g.   Richardson was shown another photo line-up and was asked to identify "Terry." Richardson circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

## XI.

## ONYEKA UDOH'S MARRIAGE TO BENNIE SMITH

A.    DOCUMENTS IN THE A-FILE FOR ONYEKYA UDOH

65.    DHS A-File Number 210-191-371 is maintained for Onyeka Udoh, a citizen of Nigeria.  The documentation in this A-File includes a copy of a marriage certificate showing that Udoh married Bennie Smith, a United States citizen, on July 4, 2011. Udoh's A-File also includes a Petition for Alien Relative, signed on August 17, 2011, by Smith.  The petition lists 15333 Van Ness Avenue in Gardena as the marital residence.

66.    Udoh's A-File also contains an application for adjustment of status, which Udoh signed on August 17, 2011.  In this application, Udoh listed her address as the purported marital residence, and Udoh denied ever seeking to procure a visa by fraud or willful misrepresentation of a material fact. The application has not yet been adjudicated.

B.    INTERVIEW OF BENNIE SMITH

67.    On or about October 7, 2011, SA De Perte and I interviewed Bennie Smith at his home in Los Angeles.  At that time, Smith provided the following:

a.    Smith was paid to marry Udoh, who he met through "Terry."  Smith had heard that "Terry" arranged sham marriages and that Americans were paid to do so.  In May 2011, Smith asked

45

"Terry" about it.  "Terry" said that it is easy to do and that Smith could earn $4,000.

b.    About three weeks later, Smith met "Terry" and Udoh at an IHOP restaurant in Los Angeles.  Udoh explained to Smith that if Smith married, she could live and work in the United States.  Smith agreed to marry Udoh.

c.    "Terry" drove Udoh and Smith to Sam's Club, so that Udoh and Smith could open a joint account.  Inside the store, "Terry" directed Smith to smile as "Terry" took pictures of Smith and Udoh together.

d.    Smith and Udoh were married on July 4, 2011, at a wedding chapel in Los Angles.  Smith's mother, "Terry," and some family members of Udoh attended.  Smith's mother knew that Smith's marriage to Udoh was not legitimate.  After the ceremony, Udoh gave Smith an envelope containing $1,000.  Udoh and Smith then ate dinner at a Red Lobster restaurant, where they took more pictures together.

e.    "Terry" took Smith and Udoh to Wells Fargo or Bank of America to open a joint bank account to make the marriage look real.

f.    Smith and Udoh went to the DMV together.  Udoh wanted Smith's name to be listed on the registration for Udoh's vehicle and for Smith to obtain a new identification card with

46

Udoh's address on it.

g.    In August 2011, "Terry" drove Udoh and Smith to see a lawyer whose office was located near Wilshire Boulevard in Los Angeles.    "Terry" had set up the meeting.    At the lawyer's office, Smith filled out immigration paperwork for Udoh and her two children.    After the meeting, Udoh handed Smith an envelope containing $1,000 in cash.

h.    Udoh told Smith that Smith needed to be ready for their interview with immigration officials.    Udoh stated that they needed to know each other's children's names, the layout of Udoh's house, where the computer printer was located, where they slept, their address, what day was trash day, and the contents of the refrigerator.

i.    Smith never lived with Udoh and never had sex with her.

j.    Smith was shown a photo line-up and was asked if he could identify "Terry."    Smith circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

C.    <u>CONSENSUALLY MONITORED RECORDING BETWEEN SMITH AND UDOH</u>

68.    On or about December 14, 2011, HSI SA David Guppenberger and I conducted a consensually monitored meeting between Bennie Smith and Onyeka Udoh.    The following occurred during this meeting:

a.    Smith met Udoh at Smith's house in Gardena.  Also present was Joseph Udoh, the real husband of Udoh.

b.    Smith and Udoh discussed their upcoming meeting with the immigration authorities.  Udoh told Smith that they needed to have the same story and say the same things.

c.    Udoh said that "Terry" instructed her not to acknowledge knowing him ("Terry").  Udoh stated that Udoh and Smith no longer needed "Terry" and that "Terry" would not be at the meeting with the immigration officials.  Udoh said that Smith should come to her with any questions.

d.    Udoh stated that she and Smith had to stay married for two years.  Udoh stated that Smith must know the address of where Udoh lived.  Joseph asks Smith if he knew the zip code and then tells it to Smith.

e.    Udoh stated that Udoh and Smith needed to review information for their immigration interview.  Udoh stated to Smith, "If you help us, we will help you."  Udoh then gave Smith two pages of information that Smith needed to memorize for the CIS interview.

D.    INTERVIEW OF TOMIKO COWLEY, MOTHER OF BENNIE SMITH

69.    As discussed earlier in this affidavit, on or about February 21, 2012, HSI SA McClellan and I interviewed Tomiko Cowley at her home in Los Angeles.  In addition to what was

48

discussed earlier in this affidavit, Cowley provided the following:

a.    Cowley knew that ILEGBAMEH arranged the fake marriage involving her son Bennie Smith.  ILEGBAMEH had recently been to her house and instructed Cowley not to admit to investigators that she knew him or that Smith received any money to marry Udoh.  ILEGBAMEH also instructed Cowley to say that Smith did not live with her and that he lived in Gardena.

b.    ILEGBAMEH told Cowley that agents from the Department of Homeland Security may come to her house and ask questions.

70.    Later on the same date, I called Cowley and asked her how long she had lived in her home in Los Angeles.  Cowley replied that her family had owned the house since the 1960s and that she lived in the house since 2009.  Cowley also stated that her son, Bennie Smith, had been living with her except for a period of time when he lived with the mother of his child.

## XII.

### MICHAEL NIEMCHI MUONEKE'S MARRIAGE TO DEMETRIC MIMS

A.    DOCUMENTS IN THE DHS A-FILE FOR MICHAEL NIEMCHI MUONEKE

71.    DHS A-File Number 210-102-146 is maintained for Michael Niemchi Muoneke, a citizen of Nigeria.  The documentation in this A-File includes a copy of a marriage

49

certificate showing that Muoneke married Demetric Mims, a United States citizen, on January 29, 2011. Muoneke's A-File also includes a Petition for Alien Relative, signed on March 18, 2011, by Mims.

72. Muoneke's A-File also contains an application for adjustment of status, which Muoneke signed on May 16, 2011. In the application, Muoneke denied that he ever sought to procure a visa by fraud or willful misrepresentation of a material fact. The application was approved on October 12, 2011.

B.   INTERVIEW MARVETTE MIMS, DAUGHTER OF DEMETRIC MIMS

73. On or about December 5, 2011, SA De Perte and I interviewed Marvette Mims, the daughter of Demetric Mims, at Marvette's home in Los Angeles. At that time, Marvette stated the following:

a.   Marvette knew "Terry" through her friend Victoria Childs. "Terry" arranged marriages so that aliens could obtain green cards. Childs told Marvette that "Terry" is a "trick." Childs connected "Terry" with one of her friends, whom "Terry" paid for sex.

b.   "Terry" told Marvette that she could earn $7,000 by traveling to Africa to marry someone or she could earn $4,000 by marrying an alien already in the United States. However, Marvette was already married.

50

c.    Marvette knew that "Terry" arranged the marriage of her mother, Demetric Mims, to a Nigerian.

d.    Demetric Mims lived with Marvette, but Muoneke, the sham husband, did not live there. Muoneke instead came to the house approximately once per week.

e.    Marvette was shown a photo line-up and was asked if she could identify "Terry." Marvette circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

C.    INTERVIEW OF DEMETRIC MIMS

74.    On or about December 5, 2011, HSI SA McClellan and I interviewed Demetric Mims at her home in Los Angeles.[4] At that time, Mims provided the following:

a.    "Terry" arranged for Mims to marry Muoneke in exchange for money. "Terry" told Mims that he had a friend who needed to obtain immigration status. "Terry" said that if Mims married him, she would earn $4,000.

b.    "Terry" showed Mims a piece of paper detailing how the sham marriage would work. The paper stated that Mims would receive payments after the wedding ceremony, after a meeting with a lawyer, and after an immigration interview.

---

[4]    In 1998, Demetric Mims received a deferred judgment for possession of a controlled substance. Her case was dismissed in 2000.

51

    c.   After Mims married Muoneke, Muoneke gave her $1,000.

    d.   "Terry" instructed Mims that she and Muoneke needed a joint bank account, a life insurance policy, a joint Costco membership, and identification cards with the same address to make the marriage appear legitimate.

    e.   Mims and Muoneke met with a lawyer, D.V. "Terry" arranged the meeting and drove Mims and Muoneke to the lawyer's office for their first visit. Mims and Muoneke saw the lawyer three times. However, before they had their interview with the immigration officials, D.V. withdrew her representation of Muoneke, because she discovered that "Terry" had been arranging fraudulent marriages.

    f.   Mims was shown a photo line-up and was asked if she could identify "Terry." Mims circled, initialed, and dated photo number 4, which was a photo of ILEGBAMEH.

D.   INTERVIEW OF MICHAEL MUONEKE

    75.  On or about December 5, 2011, SA McClellan and I interviewed Michael Muoneke at Mims' home in Los Angeles. At that time, Muoneke stated the following information:

    a.   While at a party, Muoneke met "Terry." "Terry" said Muoneke could stay in the United States by "Terry" arranging a marriage for him. "Terry" said Muoneke would pay

the sham wife $2,000, and would also pay "Terry" $1,000. "Terry" said he would receive $500 when "Terry" arranged the marriage and then another $500 after Muoneke was married.

   b.   In December 2010, "Terry" arranged for Muoneke and Mims to meet at a TGIFriday's restaurant. Afterwards, Muoneke paid $500 to "Terry."

   c.   In January 2011, Muoneke married Mims. After the wedding, Muoneke paid Mims $1,000 and paid "Terry" $500.

   d.   "Terry" gave Muoneke a paper that listed information that Muoneke and Mims needed to know about each other for the immigration interview.

   e.   "Terry" told Muoneke to open a joint bank account with Mims, to get a joint lease with Mims, an identification card listing Mims' address, and a life insurance policy with Mims. "Terry" also told Muoneke to take pictures with Mims.

   f.   Muoneke lived with Mims for three days prior to their meeting with an immigration officer so that they would become acquainted with each other.

   g.   Muoneke admitted that except for those three days, he did not live with Mims. Muoneke actually lived in another house in Los Angeles with a friend.

   h.   Muoneke was shown a photo line-up and was asked if he could identify "Terry." Muoneke circled, initialed, and

dated photo number 4, which was a photo of ILEGBAMEH.

## XIII.

## OTHER FRAUDULENT MARRIAGES

76.  Through the course of my investigation, I determined that the additional individuals engaged in marriage fraud.  I also determined that these same individuals conspired with ILEGBAMEH to engage in visa fraud.  These individuals, the dates of their marriages, and the dates that the aliens filed their applications for adjustment of status (Form I-485) are listed below.

| Alien Spouse | USC Spouse | Married | Filed |
|---|---|---|---|
| Doris Uche Akwukwaegbua | Hakim Carter | 8-7-10 | 9-7-10 |
| Ikechukwu Ezinwa Ekenna | Libvia Ross | 2-12-10 | 3-15-10 |
| Judith Gharevba | Ramone Blackman | 3-11-09 | 8-31-09 |
| Mercy Nididi Iboyi | Jason Thompson | 5-31-08 | 6-30-08 |
| Ngozi Monica Nwatu | Carl Cooper | 5-28-10 | 6-18-10 |
| Stella Eziaku Nwosu | Anthony Walton | 5-15-10 | 8-12-10 |
| Dike Obineche Ojigwe | Joann Jackson | 4-5-10 | 10-22-10 |
| Chukwuebuka Daniel Onyemekukwe | Monica Jones | 10-12-10 | 12-6-10 |

XIV.

CONCLUSION

77.    Based upon the foregoing, there is probable cause to believe that ALAKE "TERRY" ILEGBAMEH has committed violations of Title 18, United States Code, 371 (Conspiracy); and Title 18, United States Code, 1546(a) (False Statement in Immigration Application).    I therefore request that the Court issue the requested criminal complaint and arrest warrant.


_____/S/_____
Dan Carney
Special Agent, HSI


Subscribed to and sworn to before me

this 6th day of March 2013.


## Jay C. Gandhi

_____

UNITED STATES MAGISTRATE JUDGE